IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville November 17, 2015

**STATE OF TENNESSEE v. QUINCY HOWZE**

**Appeal from the Criminal Court for Shelby County**
**No. 1002660     James M. Lammey, Judge**

_____

**No. W2014-02449-CCA-R3-CD  -  Filed December 15, 2015**

_____

Appellant, Quincy Howze, stands convicted of one count of aggravated robbery, a Class B felony.  The trial court sentenced him as a Range II, multiple offender to serve twenty years at 100% release eligibility based on his two prior convictions of the same.  Appealing his conviction and sentence, appellant raises three issues:  (1) whether the trial court erred in omitting a special jury instruction on identity; (2) whether the evidence was sufficient to support his conviction; and (3) whether the trial court erred in sentencing him to the maximum term allowed by law.  Upon our review, we affirm the judgment of the criminal court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROBERT H. MONTGOMERY, JR., JJ., joined.

Claiborne Hambrick Ferguson (on appeal) and Joseph Andrew McClusky (at trial), Memphis, Tennessee, for the Appellant, Quincy Howze.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Amy P. Weirich, District Attorney General; and Jose Francisco Leon, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This matter concerns the July 22, 2009 robbery of John McGee in the parking lot of F&G Liquors in Memphis, Tennessee.[1]

_____

[1]  Although the record at trial contains references to a first trial, we are unable to locate the disposition of appellant's first trial and the reason(s) for this subsequent retrial.

## I. Facts

At appellant's April 21, 2014 retrial, Cory Minga, the owner of F&G Liquors located at the corner of Southern Avenue and Belt Line Street in Memphis, testified that in addition to selling liquor, the store's business also included cashing checks. On July 22, 2009, around 9:00 a.m., Mr. Minga was working when a customer with whom he was acquainted, John McGee (the victim), entered the store and cashed a check. Shortly thereafter, the victim re-entered the store, pale-faced and shaken, and informed Mr. Minga that he had just been robbed in the parking lot. Mr. Minga called 9-1-1 and reported the robbery. Upon questioning by the 9-1-1 operator, Mr. Minga began to relay the answers supplied by the victim, but he then passed the telephone to the victim so that he could answer the questions directly. Mr. Minga recalled that the victim described the gunman as being a young, skinny black male. Officers from the Memphis Police Department ("MPD") subsequently arrived and gathered information from both men regarding the robbery.

Mr. Minga stated that the store was equipped with video surveillance cameras. The recording captured the incident in its entirety. Mr. Minga explained that appellant first drove past the liquor store and then backed his car into the parking lot. When the victim exited the store, appellant walked up behind him before the victim could enter his truck. Mr. Minga said that appellant drove a black four-door car with chrome wheels and mirror-tint on all windows except for the driver's window. Prior to that time, Mr. Minga had never seen a vehicle matching that description in the area of his store. He saw the same car the following week as it was driving down Belt Line Street and turning onto Southern Avenue. Mr. Minga was on the telephone with MPD Officer Veronica Crutchfield at the time, and he indicated to the officer that he had just seen the vehicle. Officer Crutchfield and her partner, Officer Jason Randolph, had responded to the scene of the robbery. Based on that information, appellant was subsequently apprehended.

The victim testified that on the morning of the robbery, he checked his post office box and then drove to the store to cash his check. He recalled that as he exited the store, he was about to insert his key into his truck's ignition when someone walked up behind him and said, "'Give me your wallet.'" The victim turned around and observed a silver-plated .357 handgun aimed at his head. The victim complied with the gunman's order, and the gunman instructed the victim to get into his truck. The gunman threatened, "'[L]ook straight ahead or [I'll] f***** kill [you].'" The victim stated that the contents of his wallet included $191 in cash, two debit cards, his social security card, his voter registration card, and some photographs. He said he turned over his property because he "had a pistol pointed at [his] head, and [he] feared for his life." He clarified that he was certain of the caliber of the handgun based on his two tours of duty with the United States Marine Corps. The victim described the gunman as wearing a black "doo-rag," a black

shirt, and long denim shorts. The gunman wore his hair in "corn [rows]" or braids. He did not wear a mask of any sort or obscure his face.

The victim noted that the gunman drove a black, four-door car with mirrored tint and chrome wheels. He observed that all of the windows were tinted except for the driver's side window, which bore a "regular" or "factory" light tint. After the robbery, the victim re-entered the liquor store, where the owner telephoned 9-1-1 for him. He was permitted to walk behind the glass to converse with the operator. Subsequently, the victim viewed a photographic array administered by Lieutenant Dexter Moses wherein he identified appellant. At trial, the victim was shown a black "doo-rag," and he identified it as the one appellant was wearing during the robbery. The victim testified that none of his property was returned to him.

The victim acknowledged that at the preliminary hearing, he was unable to identify appellant. He attributed that to the fact that appellant had changed his appearance. At the hearing, appellant had combed back his hair and was wearing glasses.

The State presented prior testimony of Officer Veronica Crutchfield Howard, who could not be present at appellant's trial.[2] At the time of the prior testimony, Officer Howard was a sixteen-year veteran of the MPD and was assigned to the Orange Mound community of Memphis. She was on duty on the day of the robbery and responded to F&G Liquor Store where she first observed the victim. She described the victim as "very frantic and upset" after having been robbed by a black male wielding a silver handgun. She and her partner, Officer Randolph, gathered information pertaining to the gunman's description and the car he drove. They broadcast the information and then went inside the store to view the video surveillance footage. In the video, Officer Howard could see the gunman's vehicle as it backed into the parking lot as described by Mr. Minga. She described it as "possibly" a Honda Prelude with mirror tint. The entire robbery was also captured on tape. After viewing the video, Officer Randolph released a second broadcast.

Subsequently, on July 28, Officer Howard was parked on a street behind the liquor store when she saw the gunman's vehicle drive by. She pulled in behind the vehicle and advised officers that she was in pursuit of a vehicle she had observed in connection with a previous robbery. While driving, she telephoned Mr. Minga and told him that the suspect vehicle was driving toward his store. Mr. Minga saw the car at that time and confirmed the identification. Officer Howard lost sight of the gunman's vehicle during the pursuit but regained visual contact with it when officers stopped the vehicle in the vicinity. When

---

[2] Officer Crutchfield had since married and had changed her surname to Howard. Officer Howard's testimony was read by Connie Justice in a question-and-answer format with the assistant district attorney general. The record revealed that Officer Howard was on medical leave at the time and that her testimony from appellant's first trial was read into the record.

she arrived at the scene, appellant had already been placed in the back of a squad car. She said that appellant was heavier then than he was at the preliminary hearing and that he had braids in his hair at the time of his arrest but not at the hearing. At the hearing, appellant was "clean" and "dressed up." He also wore glasses.

Juaquatta Harris, a twenty-four-year employee of the Shelby County Sheriff's Office, stated that her duties involved monitoring and disseminating inmate telephone calls. Through her, a fifteen-minute telephone call that was placed by appellant on September 4, 2009, while he was incarcerated, was introduced into evidence. The State "pinpointed" two specific sections of the conversation for the jury. In the first segment, appellant is heard to tell the other party that with regard to the victim's identification of him, "They probably showed dude a picture of me." He is later heard to say:

> He ain't gonna be able to pull me out, watch . . . me havin' that blue shirt . . . . I'm 'bout to pick four people to go in there with me . . . on this sit-down hearing . . . . When what's-his-name come in the tank to get me, I'm gonna . . . I want him, him, him, him, to come sit with me . . . . They do not play fair.

MPD Officer Jason Randolph testified next. His testimony was substantially similar to that of Officer Howard; however, he identified from the video surveillance that appellant's vehicle was actually a Mitsubishi Gallant rather than a Honda. Based on his identification of the car, Officer Randolph issued a second broadcast containing a correct description. As Officer Howard continued to interview the victim, Officer Randolph and other officers began to canvas the neighborhood looking for the vehicle.

Officer Randolph recalled the events surrounding appellant's capture on July 28. He said that he received an excited telephone call from Officer Howard, who had just seen the vehicle. He joined the pursuit of appellant and stopped appellant shortly thereafter. Officer Randolph learned that appellant was driving with a suspended license and then patted him down and placed him in the back seat of the squad car. Officer Randolph observed a black "doo-rag," a black t-shirt, and a pair of gloves in the floorboard of appellant's back seat. When he pulled over appellant, appellant wore his hair in braids and did not wear glasses.

On cross-examination, Officer Randolph clarified that based upon the victim's description of appellant, he issued the first broadcast stating that appellant was thin and around 5′ 9″ in height. After viewing the video surveillance, Officer Randolph issued the second broadcast that described appellant as stocky with an estimated weight of 230 to 240 pounds. Officer Randolph acknowledged that appellant's vital statistics that recorded upon his arrest placed him at 5′ 5″ in height and 175 pounds. He agreed that

when appellant was arrested, officers did not recover the weapon or any of the victim's personal property.

MPD Lieutenant Dexter Moses testified that he administered the photographic array to the victim. He affirmed that he did not coach the victim in any way and that the victim unequivocally identified appellant as the perpetrator within "seconds." Lieutenant Moses stated that at the time of the offense, he attended a meeting with the robbery division of the police department to share information about current cases every morning. There were no other vehicles similar to appellant's vehicle involved in any robberies at that time.

Upon this evidence, the State rested its case-in-chief, and appellant rested his case without presenting any proof. After deliberations, the jury found appellant guilty as charged in the indictment.

At the sentencing hearing, the State introduced appellant's presentence report. No witness testimony was presented. The trial court found that appellant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his appropriate range of punishment as a Range II, multiple offender and placed great weight on that enhancement factor. *See* Tenn. Code Ann. § 40-35-114(1). The court opined that appellant had no chance of rehabilitation, stating that appellant had done nothing in his life "except cause havoc" and that society had to be protected from appellant. The trial court noted that appellant had previously enjoyed the benefit of two concurrent eight-year terms of imprisonment for two counts of aggravated robbery, even though he could have been sentenced to twelve-year consecutive sentences. The trial court reasoned that appellant was never going to contribute to society. Accordingly, the trial court sentenced appellant to twenty years in confinement, which was the maximum sentence available. It is from this judgment that appellant now appeals.

## I. Analysis

Appellant presents three issues for review: (1) whether the trial court erred in omitting a special jury instruction on identity; (2) whether the evidence was sufficient to support his conviction; and (3) whether the trial court erred in sentencing him to the maximum term allowable by law.

## A. Special Jury Instruction on Identity

Appellant argues that the trial court erred by not giving the jury a special instruction on identity pursuant to *State v. Dyle*, 899 S.W.2d 607 (Tenn. 1995). The State responds that there was no error and that if there were, it would be harmless.

In *Dyle*, our supreme court considered the different approaches undertaken by various jurisdictions in addressing identity and eyewitness identifications with the jury. 899 S.W.2d at 610-12. Recognizing "that accuracy of eyewitness testimony is affectable by the usual universal fallibilities of human sense perception and memory," our supreme court hypothesized that "this testimony is prone to many outside influences (police interrogations, line-ups, etc.) and is often decisive." *Id.* at 612. "In light of this acknowledgment, [the court found] that the pattern identity instruction traditionally given in Tennessee [was] not adequate in cases where identity is a material issue." *Id.* Accordingly, the court promulgated the following instruction:

One of the issues in this case is the identification of the defendant as the person who committed the crime. The state has the burden of proving identity beyond a reasonable doubt. Identification testimony is an expression of belief or impression by the witness, and its value may depend upon your consideration of several factors. Some of the factors which you may consider are:

(1)     The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of time available for observation, the distance from which the witness observed, the lighting, and whether the person who committed the crime was a prior acquaintance of the witness;

(2)     The degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness' own recollection;

(3)     The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and

(4)     The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

Again, the state has the burden of proving every element of the crime charged, and this burden specifically includes the identity of the defendant as the person who committed the crime for which he or she is on trial. If after considering the identification testimony in light of all the proof you have a reasonable doubt that the defendant is the person who committed the crime, you must find the defendant not guilty.

*Id.* The court clarified that the aforementioned instruction *must* be given when identification is a material issue and it is requested by defense counsel. *Id.* "If identification is a material issue and the defendant does not request the instructions, failure to give it will be reviewable under a Rule [36] harmless error standard." *Id.* Because a question regarding the propriety of jury instructions is a mixed question of law and fact, the standard of review is *de novo* with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

The harmless error doctrine espouses the rule that "[a] final judgment . . . shall not be set aside, unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). "Generally, in modern jurisprudence application of the harmless error doctrine is the rule rather than the exception." *See State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998). "The harmless error doctrine is an embodiment of the fundamental premise that 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" *State v. Momon*, 18 S.W.3d 152, 165 (Tenn. 1999) (quoting *State v. Howell*, 868 S.W.2d 238, 253 (Tenn. 1993)).

At trial, appellant did not request a special jury charge on identity, nor did he raise this issue in his motion for a new trial. Accordingly, we review the trial court's failure to *sua sponte* charge the jury with respect to identification under a harmless error analysis. We emphasize that the necessity for an instruction on identity is implicated by a finding that identity is a material issue. *Dyle,* 899 S.W.2d at 612. The *Dyle* court defined "material issue" as follows: "Identity will be a material issue when the defendant puts it at issue or the eyewitness testimony is uncorroborated by circumstantial evidence." *Id.* at 612 n.4. Based upon that definition, our *de novo* review of this matter leads to the conclusion that identity was a material issue due to the conflict between the witnesses' description of the suspect and the victim's inability to identify appellant at the preliminary hearing as highlighted throughout the trial by defense counsel.

Nevertheless, we consider the trial court's failure to *sua sponte* read the full instruction on identity to the jury to be harmless error. Appellant was identified by the victim "within seconds" of being shown the photographic array; the victim identified appellant at trial; appellant was driving the same vehicle as that described by the victim and depicted on the video surveillance tape; and appellant was in possession of a "doo-rag" and black shirt that were substantially the same as those worn by the perpetrator. Although the victim initially was unable to identify appellant at the preliminary hearing, he attributed his mistake to appellant's change in appearance. Said change in appearance seems to have been carefully calculated and manipulated by appellant, as evidenced by his recorded jail conversation wherein he declared his intention to introduce deception and misdirection into the upcoming preliminary hearing proceedings. Defense counsel masterfully highlighted the inconsistencies between the witnesses' descriptions of

appellant as well as the difference between their descriptions and appellant's actual physical stature. The trial court instructed the jury using the "abbreviated" instruction on identity and also properly instructed the jury with regard to credibility of witnesses. Taken together, it was the jury's province to assess the credibility of witnesses and their identification of appellant, and it obviously credited the State's witnesses. Considering the whole record, we cannot say that an error involving one of appellant's substantial rights "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Appellant is not entitled to relief.

## B. Sufficiency of the Evidence

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Appellant concedes that the evidence at trial left "little doubt that John McGee was the victim of an aggravated robbery." Citing Tennessee Code Annotated sections 39-13-401 and 402, he states that "[the victim's] assailant used a deadly weapon to put [the victim] in fear to steal from his person." We, too, agree that the elements of aggravated robbery were established by the proof adduced at trial.

Appellant's sole challenge to the sufficiency of the evidence involves his identity as the perpetrator. Having dispensed with this issue *supra*, we find no merit in appellant's contention. He is without relief as to this claim of error.

## C. Sentencing

Appellant contends that the trial court did not adequately explain its sentencing decision on the record and that as a result, we should either remand this matter for resentencing or conduct a *de novo* review on appeal. He further maintains that assuming *arguendo* that the trial court followed the mandated procedure, it nevertheless abused its discretion. We disagree.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. § 40-35-114, -210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. See *id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id*. § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving

applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (*citing State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

We disagree with appellant's position that the trial court failed to place the reasons for its decision on the record. To the contrary, in keeping with the statutory requirements, the trial court enunciated that in fixing appellant's sentence, it consulted the sentencing principles contained in the Tennessee Code Annotated. It applied and gave great weight to one enhancement factor – that appellant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his appropriate range. Tenn. Code Ann. § 40-35-114(1). The trial court specifically considered the remaining enhancement factors on the record and concluded that they were inapplicable.

With regard to mitigating factors, appellant proffered as a mitigating factor that he suffered from paranoid schizophrenia. Tenn. Code Ann. § 40-35-113(13). In response, the trial court stated that if appellant was medicated for his condition, he should have been "conscious/aware" of what he was doing when he committed the robbery. Moreover, trial counsel clarified that "mental health was never an issue at trial and wasn't part of the defense." Based upon that statement, the trial court said, "I understand, but to say that that's some sort of mitigating circumstance, it's kind of hard to imagine how that could be." Appellant also advanced in mitigation that he had a ten-year-old daughter who was disabled. *Id.* However, upon further questioning, it was ascertained that the

child resided with her mother. The trial court pondered, "So, . . . where does the child come into this at all?" Accordingly, the trial court rejected this as a mitigating factor.

Although the trial court discussed the inadequacy of appellant's prior sentences and the unfathomable nature of the crime of aggravated robbery, this "dicta" does not operate to remove the presumption of reasonableness from its decision. Because the trial court followed the sentencing guidelines as well as our supreme court precedent in *Bise* in imposing a within-range sentence, the trial court's decision enjoys a presumption of reasonableness that we will only review for abuse of discretion. Based upon the record developed at trial and at sentencing, we cannot conclude that the trial court abused its discretion in sentencing appellant to serve twenty years at 100% release eligibility. His criminal record is fraught with two prior violent felonies, one prior nonviolent felony, and numerous misdemeanors. He is not entitled to relief.

## CONCLUSION

Based upon our review of the record, the briefs of the parties, and the applicable legal authority, we affirm the judgment of the criminal court.

_____
ROGER A. PAGE, JUDGE